OPINION
{¶ 1} This appeal arises from an action brought in the Fairfield County Court of Common Pleas by plaintiff-appellant David Lister against defendant-appellee Farmers Insurance of Columbus, Inc. ("Appellee" or "Farmers").
 STATEMENT OF FACTS {¶ 2} This matter concerns a fire on February 4, 2001 at a home owned by appellant and his former wife. The fire was started by Tamara Lister, a named insured under the homeowner's policy issued by appellee, Farmers, in an attempt to commit suicide. (R. 155A, T. at 745). At the time of the fire, appellant and Mrs. Lister were separated and were in the process of dissolving their marriage. Prior to the fire, Mrs. Lister, as well as the Listers' children, had vacated the residence at 3380 Blacklick Eastern Road in August, 1999. (R.155A, T. at 143-144). However, at the time of the fire, both appellant and Mrs. Lister were named insured's on a homeowner's policy issued by Farmers and insuring the residence at the address above. In addition, the Listers identified the Huntington Bank as an additional insured on the policy due to a mortgage on the residence in effect at the time of the fire.
 {¶ 3} Appellant, Mr. Lister, submitted his claim to Farmers the day after the fire. Farmers' investigation of the underlying incident began immediately. Farmers assigned the claim to one of its claim representatives, Karen Wallace. Ms. Wallace spoke to appellant by telephone on February 5, 2001. (R. 155A, T. at 656). Ms. Wallace immediately made arrangements for board-up and winterizing of the property to preserve the home from any further damage. (R. 155A, T. at 657-658). Ms. Wallace also contacted Unified Investigations to perform a cause and origin investigation, in light of the nature of the loss as described by Appellant. (R.155A; T. at 659).
 {¶ 4} On February 7, 2001, Ms. Wallace and Marcia Halsey, Senior Special Investigator for Farmers, met Appellant at the home, inspected the scene and obtained a recorded statement from Appellant regarding the loss. (R. 155A; T. at 660-61). Thereafter, Ms. Wallace asked for and was given authority to transfer the claim to the large loss unit of Farmers. (R. 155A; T. at 663).
 {¶ 5} On February 7, 2001, Farmers assigned the claim to Bart Boston, a Senior General Adjuster with Farmers. Mr. Boston had been employed by Farmers since 1992, serving as a claims representative in Farmers Large Property Unit from September, 1999 through May 2002. (R. 155A; T. at 679-680). Mr. Boston has been involved in handling and investigating over one hundred fire loss claims with Farmers. (R. 155A; T. at 686). He has also prepared over a thousand estimates for building damage caused by fire and other losses with Farmers. (R. 155A; T. at 687-88).
 {¶ 6} Mr. Boston met appellant at the scene on February 8, 2001. (R. 155A; T. at 693). At the time of this first meeting, Mr. Boston went through the residence with appellant, inspected the fire and smoke damage, prepared a list of some of the contents in the residence and took photos of the interior of the residence. (R. 155A; T. at 844-45). In assessing the contents in the home, Mr. Boston testified that he relied upon appellant to assign a value to those items he logged as being in the home at the time of this initial walk-through. At the time of that first meeting, Mr. Boston discussed with appellant the implications of a claim involving an innocent spouse. He also explained that since a named insured was involved in starting the fire, he would expect an investigation to include examinations under oath. (R.155A; T. at 846-47). Mr. Boston also explained the need for the Proof of Loss and explained the process to submit a formal claim to Farmers arising out of the fire. As for his visual inspection of the residence, Mr. Boston testified that, among other things, that house was heated with passive heat or fireplaces (R.155A; T. at 849). Further Mr. Boston noted that the house, especially the upper two levels, were in a state of disarray (R. 155 A; T. at 849). Finally, he noted that there were structural issues in the house that needed addressed and inspected by an engineer. (R. 155A; T. at 859).
 {¶ 7} Mr. Boston returned to the residence the next day, February 9, 2001, and met with appellant. Mr. Boston prepared an additional list of personal property items present at the residence, focusing on items on the outside of the house. (R.155A; T. at 854; 858). Again, Mr. Boston relied upon appellant to assign a value to each of these items. Among other things, Mr. Boston again discussed with appellant the unique situation of this claim which involved arson by a named insured and an innocent spouse, which would likely necessitate examinations under oath and an unknown time frame to complete the handling of the claim. (R. 155A; T. at 858). Mr. Boston also discussed with appellant the intention of getting an advance expense payout to appellant and began the process to obtain substitute housing arrangements for appellant. (R.155A; T. at 858-59). Mr. Boston also reviewed the inventory lists he prepared with appellant. (R.155A; T. at 859).
 {¶ 8} Mr. Boston inspected each area of the residence, including the three floors in the main structure, the two additions, the attic and the garage. On February 9, 2001, Mr. Boston completed a damage estimate for the structure. (R.155A; T. at 863). In Mr. Boston's opinion, based upon his experience in adjusting fire damage claims, the damage was limited to the main structure of the home and was primarily smoke damage requiring cleaning and some painting. (R. 155A; T. at 860-62). Mr. Boston's damage estimate for the entire structure totaled $93,529.79. (R. 155A; T. at 864-65).
 {¶ 9} In addition to his own estimate of the structural damage, as part of the handling of this claim, Mr. Boston retained Thompson Building Associates to inspect the residence and prepare an estimate of the damage and repair costs (R. 155A; T. at 865). Thompson Builders submitted their estimate to Mr. Boston on or about April 5, 2001. Thompson Builder's estimate was lower than that prepared by Mr. Boston, although he felt it was not as complete as his (R.155A; T. at 866). Thompson Builder's estimate for the structural damage totaled $63,711.65. (See, Farmers Exhibit 10).
 {¶ 10} Mr. Boston sent letters to appellant and Mrs. Lister on February 13, 2001 to the insured address and to appellant at his work address, 12920-D Stonecreek Drive, Pickerington, Ohio, acknowledging submission of a claim and setting forth the requirements, as outlined in the insurance policy, to submit a Sworn Statement in Proof of Loss. Mr. Boston also provided the Listers with a Proof of Loss form to assist in submitting any claim. The letter specified that, pursuant to the terms of the applicable policy, a Sworn Statement in Proof of Loss in this matter was due on or before April 13, 2001 (R. 155A; T. at 872; 874). Appellant received this letter at his work address, 12920-D Stonecreek Drive, Pickerington, Ohio by certified mail on February 15, 2001. (R.155A; T. at 938). The letter sent to appellant and Mrs. Lister at the insured address of 3380 Blacklick Eastern Road was returned by the post office on February 16, 2001 as a forwarding order in place at that address had expired. (R.155A; T. at 874).
 {¶ 11} On that date, Mr. Boston also forwarded a letter to the mortgage company identified as an additional insured on the Lister policy, Huntington Bank. (R. 155A; T. at 872-873; Farmers Exhibit 13). This letter requested that Huntington Bank set forth any claims they may have arising out of the fire at the Lister residence and provided a proof of loss form for Huntington Bank to complete and submit as part of any claim they intended to pursue. At no time thereafter did Huntington Bank ever respond to this correspondence. (ld.).
 {¶ 12} Mr. Boston again met with appellant at the home on February 23, 2001. During this meeting, Mr. Boston again discussed the claims process and reviewed the contents lists completed during his initial inspection of the loss. (R. 155A; T. at 875, 902). They also discussed other issues with the loss, including ensuring that temporary heat remained in place at the home to avoid additional damage. (ld.).
 {¶ 13} By April 20, 2001, Mr. Boston had not received any further contact from appellant with respect to his claim. On that date, he sent a follow-up letter to appellant and Mrs. Lister advising that the Sworn Statement in Proof of Loss had not yet been received and that one would have to be received to formally submit a claim under the policy (R. 155A; T. at 876-877; Farmers Exhibit 16). Mr. Boston extended the time in which appellant needed to submit his proof of loss until May 21, 2001. (R.155A; T. at 876).
 {¶ 14} On May 21, 2001, Mr. Boston spoke to appellant by telephone with respect to the claim. Appellant requested an extension of time in which to submit his Proof of Loss, which Farmers granted. Mr. Boston again explained the need for the Proof of Loss, with a list of the contents and structural claim he was submitting to "get things going." (R-155A; T. at 879). Mr. Boston sent a letter to appellant that day, again explaining the process for submitting a claim and extending the time frame for appellant to do so under the policy. (R.155A; T at 880; Farmers Exhibit 18).
 {¶ 15} On June 25, 2001, Mr. Boston granted another ten-day extension for appellant to submit his proof of loss, having not received any information by that date from Mr. Lister. (R. 155A; T. at 880). On July 9, 2001, Mr. Boston and appellant again discussed the filing of his proof of loss by telephone. Mr. Boston advised that he needed the Proof of Loss to move forward with the claim, including something to substantiate his structural claim, which up to that date appellant indicated he felt was higher than Mr. Boston's estimate. (R. 155A; T. at 881). Appellant advised Mr. Boston that he was unable to obtain an estimate from a contractor to substantiate his valuation of the structural claim, because none would agree to submit an estimate in writing. (ld.).
 {¶ 16} Appellant submitted his Sworn Statement in Proof of Loss to Farmers on July 30, 2001. (R. 155A; T. at 882). In response, Mr. Boston acknowledged receipt of same and advised, in writing, that the claim was being held without action pending further evaluation and investigation of the claim. (R. 155A; T. at 882-83).
 {¶ 17} Mr. Boston also immediately faxed the information received to counsel retained by Farmers to assist in investigating the claim. (R.155A; T. at 882). Mr. Boston waited for confirmation from counsel that the examinations under oath of the insureds, both appellant and Mrs. Lister, had been completed as part of the investigation of this claim. (R. 155A; T. at 884-885).
 {¶ 18} In addition to Mr. Boston, Ms. Halsey also investigated aspects of appellant's claim. Ms. Halsey was on scene within two days of the claim being submitted with Ms. Wallace on February 7, 2001 and was present for the initial interview with appellant. (R. 155A; T. at 965). Ms. Halsey had an opportunity to inspect the entire home at that time. According to Ms. Halsey, the home was messy, sparsely furnished and did not appear like anyone had been living there. (R.155A; T. at 966). The upstairs of the home appeared like it had been trashed. (R. 155A; T. at 969) and the yard appeared unkept. (R. 155; T. at 971).
 {¶ 19} Aside from interviewing appellant at the scene immediately after the claim was submitted, Ms. Halsey also interviewed a number of other individuals regarding the claim, including Tamara Lister. (R. 155A; T. at 972). Ms. Halsey investigations in the matter are reflected in 3 reports she prepared and sent to Mr. Boston and counsel. (Farmers Exhibits 32, 33, 34). Ms. Halsey interviewed Mrs. Lister on two occasions. She advised Ms. Halsey that appellant had submitted a prior fraudulent insurance claim involving wind damage to the home, where appellant damaged lawn equipment, air conditions and the French doors to the home and claimed is was damaged by a tree that fell over. (R. 155A; T. at 974-75). Mrs. Lister advised Ms. Halsey that appellant had not resided in the home for about a year and a half. (R.155A; T. at 975). In addition, Ms. Halsey interviewed a number of other individuals with respect to appellant's claim. (R.155A; T. at 983-85). She interviewed Al Garber, the contractor hired by appellant to construct the additions to the home. He advised Ms. Halsey that he had not been to the Lister residence since June 1999. Ms. Halsey interviewed Patricia Cooper, Mrs. Lister's mother, who confirmed the instance of prior insurance fraud referenced above, and also confirmed the condition of the home prior to the fire, including extensive smoke damage throughout the home prior to the fire, and the fact that appellant had not resided in the home for quite some time.
 {¶ 20} On March 14, 2001, Farmer's retained the services of Matthew J. Smith, Esq. to assist it in its investigation of this claim. (R. 155A; T. at 1008). Immediately after receiving the sworn statement and proof of loss, Smith, forwarded a letter to appellant and Mrs. Lister on July 30, 2001 at the insured address, advising of his involvement in the investigation of the claim and requesting, pursuant to the terms of the insurance policy, their examinations under oath. (R. 155A; T. at 1018-19). The following day, July 31, 2001, Smith sent identical letters to appellant. and Mrs. Lister separately at other addresses maintained by Farmers. (R.155A; T. at 1019-20; 1026-27). Appellant signed for a certified letter from attorney Smith at his work address, 12920-D Stonecreek Drive, on August 14, 2001. (R.155A; T. at 1028-29). Having received no response to the July 31, 2001 letters, counsel sent letters to appellant and Mrs. Lister on August 23, 2001, again advising of his involvement in the investigation of this claim and requesting their examinations under oath. Attorney Smith specifically indicated that appellant and Mrs. Lister were to contact his office by September 6, 2001 to schedule the examinations under oath. (R. 155A; T. at 1031). Appellant contacted counsel's office on September 6, 2001. At the time of this contact, appellant's examination under oath was scheduled for October 8, 2001 in Columbus, Ohio. Attorney Smith also forwarded a letter to Tamara Lister scheduling her examination under oath on that same day. (R. 155A; T at 1034).
 {¶ 21} On or about September 7, 2001, Smith received a letter from Attorney Richard Innis purporting to waive any claims that Mrs. Lister would have as to the proceeds arising out of the underlying fire loss. In response, Smith sent a letter to Mr. Innis with respect to Mrs. Lister's examination under oath. Smith advised Innis that despite such a waiver, Mrs. Lister still had a duty to cooperate with Farmers in their investigation of this claim as a named insured under the applicable policy. (R.155A; T. at 1035-38). Attorney Innis advised Smith that Mrs. Lister would not appear for an examination under oath in this matter as a result of criminal charges pending against her arising out of the underlying fire. (R. 155A; T. at 1039). Around this time, and prior to the examination under oath of appellant, Smith also received notice that appellant was now represented by counsel with respect to his claim with Farmers. (Id.).
 {¶ 22} The examination under oath of appellant took place on October 8, 2001. Appellant provided no support or evidence for the estimates he had included in his Sworn Statement in Proof of Loss as required under the policy. He provided no documentation to support his structural claim of $207,000 and no documentation to support the value of the contents claim. (R. 155A; T. at 1048-50). Appellant was unable to provide any evidence or documentation to indicate he was residing in the home prior to the fire, by way of utility bills or other information. (R. 155A; T. at 1045-46). Appellant did confirm that he received all of the letters from Farmers requesting information on his claim, including the proof of loss, but appellant was unable to explain or justify the delay in getting the proof of loss to Farmers until July 30, 2001. (R.155A; T. at 1047).
 {¶ 23} On the date of the examination under oath, Mrs. Lister telephoned attorney Smith's office on two occasions indicating that she would be unable to appear for an examination under oath in this matter. (R. 155A; T. at 1051). On October 11, 2001, Smith corresponded with appellant's counsel requesting additional documentation and information needed for the investigation of this claim in response to his testimony received at his examination under oath, again requesting cooperation in providing information needed to support the value of his claim. (R. 155A; T. at 1052-55). Also on that date, Smith sent correspondence to Mr. Innis, and attorney Ronald C. Stoughton, Mrs. Lister's attorney in the criminal case arising out of the underlying fire, requesting further cooperation from counsel to arrange for her examination under oath. (R. 155A; T. at 1056). In response, Smith received a letter from Stoughton advising that Mrs. Lister would not appear for an examination under oath, asserting her Fifth Amendment concerns with respect to the criminal case. (R. 155A; T. at 1056-57).
 {¶ 24} As a result of Mrs. Lister's refusal to appear for an examination under oath, Farmers elected to proceed with the filing of the underlying declaratory judgment action to obtain an order that Mrs. Lister does have an obligation under the policy to appear for an examination under oath. (R. 155A; T. at 1059-60).
 {¶ 25} The ability for Farmers to obtain the examination under oath of Mrs. Lister was further delayed due to other issues. The court assigned this matter to Judge Clark, who was also presiding over the criminal charges pending against Mrs. Lister arising out of the February 4, 2001 fire. On January 3, 2002, attorney Stoughton filed a disclosure and entry requesting Judge Clark not participate in this matter. By Entry of February 14, 2002, this matter was transferred to the docket of Judge Luse. (R. 155A; T. at 1065). Thereafter, on March 11, 2002, Judge Luse and counsel for the respective parties in this action participated in a telephone conference at which time Judge Luse ordered that the examination of Mrs. Lister proceed. (R. 155A; T. at 1066-67). Attorney Smith then sent a letter to attorney Stoughton on March 18, 2002, again requesting his assistance in scheduling Mrs. Lister's examination under oath. (R. 155A; T. at 1068-69). Judge Luse executed an Order requiring Mrs. Lister's appearance at an examination under oath on March 21, 2002.
 {¶ 26} Attorney Stoughton advised Smith that he would assist in making Mrs. Lister available for an examination under oath, but only after June 3, 2002, the date of her sentencing in the criminal case arising out of the underlying fire. (R. 155A; T. at 1069). Arrangements were made to make Mrs. Lister available for an examination under oath on June 11, 2001 at the Fairfield County Jail. (Id.). However, on that date, attorney Smith's office was advised that she was no longer in the Fairfield County jail, but was transferred to the Marysville Correctional facility. (R. 155A; T. at 1069-70). The parties rescheduled Mrs. Lister's examination under oath in this matter on July 24, 2002 at the Marysville Correctional facility.
 {¶ 27} The examination under oath went forward on that date. (Id.). The testimony shed light on the alleged prior insurance fraud committed by appellant, identified a number of personal property items that were claimed by appellant as damaged in the fire that were either not in the home at the time or were grossly inflated in their value. Further, the testimony shed light on the overall condition of the home prior to the fire and appellant's lack of actual occupancy of the home prior to the fire. (R. 155A; T. at 1072-75).
 {¶ 28} The examination under oath provided additional information, specifically the existence of an appraisal report of the home completed only a few months before the fire and the existence of the videotape Mrs. Lister took of the home prior to the fire. (R. 155A; T. at 1075-1076). Subsequent to Mrs. Lister's examination under oath, Farmers received the appraisal report and the videotape. The videotape showed the house in disarray, the furnishings were sparse and what furniture or other items were in the home were not comparable to the value or items appellant was seeking to be compensated for in his proof of loss. (R. 155A; T. at 1077-1079).
 {¶ 29} As part of his Sworn Statement in Proof of Loss, appellant claimed personal property loss arising out of the February 4, 2001 fire in the amount of $128,413.81, including a listed content claim of $98,093.91. Mrs. Lister and the Listers' children vacated the residence in August, 1999. (R. 155A; T. at 723, 728). When doing so, Mrs. Lister and her children removed a number of personal property items from the residence. (R. 155A; T. at 728-729). She videotaped the home to reflect that it was indeed vacant while her divorce from appellant was pending and she requested to move back into the home. (R. 155A; T. at 730; 731). During her examination under oath and again at trial, Mrs. Lister reviewed appellant's itemized contents list to support his personal property loss. (R. 155A; T. at 749-750). Mrs. Lister confirmed that a number of the items in the sworn statement and proof of loss were not present at the residence at the time of the fire. She based this testimony on the fact that she had personal knowledge that a number of the items were removed from the residence at the time she and her children vacated the residence and that a number of items claimed to have been in the home were either discarded prior to the fire or kept at another location, such as in a shed on the property or at appellant's business address. Furthermore, she confirmed that since she vacated the residence, she has been back to the residence on a number of occasions, and that she has personal knowledge that certain items set forth in the sworn statement and proof of loss were not at the residence. (R-155A; T. at 751-799).
 {¶ 30} In addition, Mrs. Lister also provided testimony with respect to the valuation of certain property items included in the Sworn Statement in Proof of Loss (Id.). Mrs. Lister confirmed that a number of the items were purchased by her and appellant during their marriage, had been present in the residence for quite some time, and that the value of the items (either by purchase price or estimated value) as set forth by appellant was in no way correct and/or greatly inflated. (Id.)
 {¶ 31} On the date of the fire, the residence was in a state of disrepair and there were very few personal property items throughout the residence. There was minimal to no food items present in the house on February 4, 2001, and what was present, mainly canned goods and other dried items that had been in the house since 1999. (R. 155 A; T. at 747). The cupboards and drawers in the kitchen at the residence contained little to no food, and what was there was littered with mouse droppings and feces. (R. 155A; T. at 746-47). Each room in the house and the attic of the house remained in a state of disrepair and in similar appearance as when she left the home in August, 1999. (R. 155A; T. at 747-48). Mrs. Lister testified that the condition of the house on the date of the fire mirrored the condition of the house for the last year and a half leading up to the fire. (R. 155A; T. at 746-48).
 {¶ 32} Mrs. Lister confirmed that the video tape that she prepared as part of the divorce proceedings accurately depicted the state of the residence at the time of the video was made in January, 2000 and that the state of the residence (both in appearance and the presence of personal property items throughout the residence) had not changed since the time she moved from the residence in August, 1999. (R. 155A; T. at 733-34; 739). Further, Mrs. Lister confirmed that she had been to the residence on a number of occasions between the time the videotape is shot in January, 2000 and the fire of February 4, 2001, and that the condition and state of the residence remained the same. (R.155A; T. at 743-744).
 {¶ 33} Further, difficulties arose with respect to Mrs. Lister's review and verification of her examination under oath. Due to Mrs. Lister being in jail at the time, Farmers did not receive notification from the court reporter that Mrs. Lister's examination under oath had been read and properly notarized until late October. (R. 155A; T. at 1082-1083).
 {¶ 34} By letter of November 11, 2002, Farmers denied appellant's fire loss claim. The denial letter issued by Farmers to appellant referred to certain portions of the insurance policy to support the denial. Farmers' purported denial of the claim was based upon evidence that appellant engaged in material misrepresentations in reference to the submission of his fire loss claim which voided the policy, not just a simple mistake as to the value of the structure and the personal property items claimed to have been damaged in the fire, material misrepresentations as to the ownership and value of this claimed personal property loss, and his occupancy of the home and the claim for damage to the structure of the residence as a result of the subject fire. (R.155A; T. at 1088).
 {¶ 35} Farmers dismissed the Declaratory Judgment action on November 8, 2004. Trial in the instant case on appellant's counterclaim began November 9, 2004. On November 17, 2004 the jury returned a verdict in favor of appellant on his breach of contract claim against Farmers in the amount of $180,000.00. The jury further returned a verdict in favor of Farmers on appellant's bad faith claim. Following additional motions, the trial court entered judgment on the jury's verdict on February 11, 2005.
 {¶ 36} Appellant David Lister then filed the instant appeal raising the following assignment of error:
 {¶ 37} "I. THE VERDICT IN FAVOR OF FARMERS INSURANCE ON MR. LISTER'S BAD-FAITH CLAIM WAS ERROR WHERE THREE (3) LEGAL ERRORS DEPRIVED THE JURY OF ESSENTIAL EVIDENCE OF FARMERS' BAD FAITH, FARMERS PRESENTED NO EVIDENCE THAT REASONABLY JUSTIFIED ITS DENIAL OF COVERAGE ON THE GROUNDS OF MISREPRESENTATION, AND EIGHT (8) INSTANCES OF FARMERS' BAD FAITH WENT UNREBUTTED.
 {¶ 38} In addition, appellant has identified the following issues as pertinent to his sole assignment of error:
 {¶ 39} A). The Trial Court Incorrectly Instructed the Jury;
 {¶ 40} B). The Trial Court Improperly Refused to Allow Evidence Regarding Farmers' Cancellation of Mr. Lister's Policy;
 {¶ 41} C). The Trial Court Erred in Allowing Farmers to Withdraw an Admission; and
 {¶ 42} D). The Combined [Sic.] of These Legal Errors, Combined with Unrebutted Evidence of Farmers Bad Faith, Demonstrate That the Jury's Verdict Was Error.
 {¶ 43} For ease of discussion we shall treat appellant's issues as separate assignments of error.
 I. {¶ 44} In his First Assignment of Error, appellant maintains that the trial court committed prejudicial error by orally instructing the jury that they could not form an adverse inference from the failure of appellee to produce evidence to support its claim of misrepresentation. We disagree.
 {¶ 45} Both parties concede that the trial court incorrectly instructed the jury on the issue of permissible inferences by inserting the word "not" when the court read its charge. The court stated, in relevant part:
 {¶ 46} "While it is not a presumption of law that such a failure to produce evidence renders it probable that the party withholding it did so because he knew that if it were produced, it would operate to his prejudice, the law does not permit you to draw such conclusions or inferences, and to give to them such weight as is warranted in your judgment". (T. at 1374). [Emphasis added].
 {¶ 47} The parties further agree that the written charge given to the jury correctly stated the law concerning permissible inferences.
 {¶ 48} In State v. Price (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus, the Ohio Supreme Court held that: "[a] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge. (Cupp v. Naughten,414 U.S. 141, 147 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] followed.)" See, also, Vargo v. Travelers Ins. Co. (1987), 34 Ohio St.3d 27, 31,516 N.E.2d 226, 230; State v. Coleman, (1988)37 Ohio St.3d 286, 290, 525 N.E.2d 792, 797; cf. Lakes v. Ford (C.A.11, 1986), 779 F.2d 1578; Francis v. Franklin (1985), 471 U.S. 307,105 S.Ct. 1965, 85 L.Ed.2d 344.
 {¶ 49} Even if the jury was erroneously instructed orally that they could not form an adverse inference from Farmers failure to produce evidence to support its claim of misrepresentation by appellant, this did not prejudice the appellant.
 {¶ 50} Accepting appellant's contention that the jury instruction on permissible inferences was erroneous, we still need to determine whether such instruction was harmless error. See Carella v. California (1989), 491 U.S. 263, 109 S.Ct. 2419,2421, 105 L.Ed.2d 218, 222.
 {¶ 51} In the case at bar, the trial court correctly instructed the jury concerning the respective burden of proof of each party:
 {¶ 52} "If you find from a preponderance of the evidence that Mr. Lister knowingly or willfully concealed from or misrepresented any material fact or circumstance to Farmers relating to the company's investigation of the fire loss, then Farmers has met its burden of proof under this defense and your verdict should be returned in favor of Farmers Insurance of Columbus, Inc. . . .
 {¶ 53} "In the law of insurance, a `misrepresentation' occurs when an insured makes an untrue statement of fact to his insurance company with the knowledge that it is untrue and with intent to deceive the company.
 {¶ 54} "* * *
 {¶ 55} "Under this provision of the insurance contract, intentional concealment or a false statement made by the insured concerning a material matter will, if proved by a preponderance of the evidence, preclude all recovery on the policy by the named insured.
 {¶ 56} "* * *
 {¶ 57} "In the event you determine that . . . Plaintiff Farmers failed to establish its affirmative defense by a preponderance of the evidence and that Farmers breached its contract of insurance with Defendant by denying his claim for coverage, you must then determine whether Farmers failed to act in good faith when it denied coverage. In order to establish that Farmers failed to act in good faith, Mr. Lister has the burden to show by a preponderance of evidence that Farmers failed to exercise good faith in processing the claim of its insured.
 {¶ 58} This requires Mr. Lister to demonstrate, by a preponderance of the evidence, that Farmers denied the claim without reasonable justification".
 {¶ 59} (T. at 1371-73).
 {¶ 60} In the case at bar the erroneous instruction is simply superfluous: the jury was properly instructed concerning the parties' burden of proof. The jury found in favor of appellant on his breach of contract claim, thereby finding that appellant did not materially misrepresent any material fact to Farmers. Accordingly, the jury was not misled by the erroneous oral instruction.
 {¶ 61} After reviewing the instructions, we hold that even if the trial court shifted the burden from Farmers on permissible inferences, the error was harmless beyond a reasonable doubt because the jury found in appellant's favor on the issue of misrepresentation.
 {¶ 62} Appellant's First Assignment of Error is overruled.
 II. {¶ 63} In his Second Assignment of Error appellant argues that the trial court committed prejudicial error by not allowing him to put forth evidence in support of his bad faith claim that following the submission of the homeowners' insurance claim at issue, Farmers cancelled his insurance policy effective August 8, 2001. We disagree.
 {¶ 64} In Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269,271, 569 N.E.2d 1056, 1058, the Supreme Court reaffirmed the longstanding test for appellate review of admission of evidence: "[o]rdinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence. The admission of relevant evidence pursuant to Evid.R. 401 rests within the sound discretion of the trial court. E.g., State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343, paragraph two of the syllabus. An appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion. State v. Finnerty (1989), 45 Ohio St.3d 104,107, 543 N.E.2d 1233, 1237. As this court has noted many times, the term `abuse of discretion' connotes more than an error of law; it implies that the court acted unreasonably, arbitrarily or unconscionably. E.g., Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140, 1142. Since the trial court has such broad discretion, the appellate court should be slow to interfere unless the court has clearly abused its discretion and a party has been materially prejudiced thereby. Cleveland v.Petko (1996), 112 Ohio App.3d 670, 676, 679 N.E.2d 1162, 1166, quoting Shimola v. Cleveland (1992), 89 Ohio App.3d 505, 511,625 N.E.2d 626, 629-630. The trial court must determine whether the probative value of certain evidence and/or testimony is substantially outweighed by the danger of unfair prejudice or of confusing or misleading the jury. Id.
 {¶ 65} In applying the abuse of discretion standard, an appellate court is not free to substitute its own judgment for that of the trial court. Berk v. Matthews (1990),53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (citations omitted).
 {¶ 66} In the case at bar, the trial court sustained Farmers Motion in Limine to exclude evidence of the cancellation of appellant's insurance policy and to exclude from evidence the written cancellation notice issued by Farmers to appellant. (T. at 245-59; 1212-1213). The trial court did permit appellant to proffer the Notice of Cancellation and testimony for purposes of appeal. (T. at 1212-13).
 {¶ 67} The crux of appellant's argument in this assignment of error is that Farmers cancelled his homeowner's insurance policy in retaliation for his filing of the claim at issue. Appellant contends that the cancellation is relevant to his bad faith claim.
 {¶ 68} In Hoskins v. Aetna Life Ins. Co. (1983),6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, the Ohio Supreme Court discussed the term "lack of good faith," stating:
 {¶ 69} "`A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.'
 {¶ 70} "* * * [I]t is clear that whenever an insurance company denies a claim of its insured, it will not automatically expose itself to an action in tort. Mere refusal to pay insurance is not, in itself, conclusive of bad faith. But when an insured [sic] insists that it was justified in refusing to pay a claim of its insured because it believed there was no coverage of the claim, `* * * such a belief may not be an arbitrary or capricious one. The conduct of the insurer must be based on circumstances that furnish reasonable justification therefore.' "Id. at 276-277, 452 N.E.2d at 1320, quoting Slater v. Motorists Mut.Ins. Co. (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, paragraph two of the syllabus, and Hart v. Republic Mut. Ins.Co. (1949), 152 Ohio St. 185, 188, 39 O.O. 465, 466,87 N.E.2d 347, 349.
 {¶ 71} Additionally, in the case of Motorists Mut. Ins. Co.v. Said (1992), 63 Ohio St.3d 690, 590 N.E.2d 1228, the Ohio Supreme Court stated at paragraphs three and four of the syllabus:
 {¶ 72} "A cause of action arises for the tort of bad faith when an insurer breaches its duty of good faith by intentionally refusing to satisfy an insured's claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal. Intent that caused the failure may be inferred and imputed to the insurer when there is a reckless indifference to facts or proof reasonably available to it in considering the claim.
 {¶ 73} "`No lawful basis' for the intentional refusal to satisfy a claim means that the insurer lacks a reasonable basis in law or fact for refusing to satisfy the claim. Where a claim is fairly debatable the insurer is entitled to refuse the claim as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim."
 {¶ 74} The Notice of Cancellation clearly shows that appellee refused to pay the claim, and canceled the policy, on the basis of claims filed on behalf of appellant, specifically, "2/04/01(fire), 12/15/00(wind and hail), 6/18/94(wind and hail), and 7/11/93(wind and hail). [Defendant's Exhibit 1, proffered at T. 1212-13). The Notice further advised appellant: "If you have cause to believe this cancellation is based on erroneous information or is contrary to law or the terms of the policy, you are entitled to have the matter reviewed by the superintendent of insurance by submitting a written application to the superintendent, not later than the cancellation effective date of the policy. If the superintendent of insurance holds a hearing, a $5.00 deposit must be made but will be returned to you if the finding is in your favor. Notice of Fair Plan availability, we suggest that you contact your Farmers agent, or any other insurance agent or broker, regarding the availability of basic property insurance through the Ohio Fair Plan. They will advise you how to make application to the facility if you are unsuccessful in securing sufficient protection elsewhere". (Id.). The Notice was mailed on July 2, 2001 and had a cancellation date of August 8, 2001. (Id.).
 {¶ 75} Even assuming, arguendo, that such opinion to cancel the policy was erroneously made, this fact alone does not evidence the dishonest purpose, moral obliquity or conscious wrongdoing which is requisite to a finding of bad faith. Furthermore, a lack of good faith embraces more than just a bad judgment or an incorrect conclusion. See Hoskins, supra, at 276; Slater v. Motorists Mutual Co. (1962), 174 Ohio St. 148 at paragraph two of the syllabus. Appellant has not submitted any evidentiary materials to support his position nor has he submitted anything to rebut the statements in the Notice of Cancellation. Nor has appellant shown how such a dispute ismaterial to the issue of bad faith. The pertinent inquiry in this case is whether appellee has demonstrated any dishonest purpose, ulterior motive or moral obliquity. Thus, even though the jury found that appellee had breached the insurance contract by refusing to pay the claim, this fact still would not evidence a lack of good faith in the cancellation of the policy. Millisorv. Motorists Mutual Co. (Nov. 19, 1990), 4th Dist. No. 1657. A dispute arising out of the cancellation of an insured's policy is not conduct that relates to the bad faith handling and payment of claims under the insurance policy. In other words, the issue to be addressed by the jury in appellant's bad faith claim was whether Farmers lacked a reasonable basis in law or fact for refusing to satisfy the claim.
 {¶ 76} In the case at bar, the trial court's decision to exclude evidence of the cancellation of the appellant's insurance policy is in line with the rules of procedure and evidence. We therefore do not find an abuse of discretion by the trial court.
 {¶ 77} Appellant's Second Assignment of Error is overruled.
 III. {¶ 78} In his Third Assignment of Error appellant contends that the trial court erred by allowing Farmers to withdraw one (1) request for admission. We disagree.
 {¶ 79} Civ.R. 36 addresses requests for admissions and provides, in pertinent part, as follows: "(A) Availability; procedures for use" * * * "The matter is admitted unless, within a period designated in the request, not less than twenty-eight days after service thereof or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney. (B) Effect of admission. Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provision of Rule 16 governing modification of a pretrial order, the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice the party in maintaining his action or defense on the merits. * * * A request for admission can be used to establish a fact, even if it goes to the heart of the case. This is in accord with the purpose of the request to admit — to resolve potentially disputed issues and thus to expedite the trial". [Citation omitted.]
 {¶ 80} "Any matter admitted under Civ.R. 36 is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Civ.R. 36(B). This court may permit the withdrawal if it will aid in presenting the merits of the case and the party who obtained the admission fails to satisfy the court that withdrawal will prejudice him in maintaining his action. Balson v. Dodds (1980), 62 Ohio St.2d 287,405 N.E.2d 293 [16 O.O.3d 329], paragraph two of the syllabus. This provision emphasizes the importance of having the action resolved on the merits, while at the same time assuring each party that justified reliance on an admission in preparation for trial will not operate to his prejudice." Cleveland Trust Co. v. Willis
(1985), 20 Ohio St.3d 66, 67, 485 N.E.2d 1052.
 {¶ 81} In Kutscherousky v. Integrated CommunicationsSolutions, LLC, Fifth District No. 2004 CA 00338, 2005-Ohio-4275
this Court stated: "[t]he test for withdrawal or amendment has two prongs. First, the court must look to whether the `presentation of the merits will be subserved' by allowing the amendment. Second, the court must address whether the withdrawal will prejudice the party that has obtained the admissions. . . . In fact, the federal courts have taken the position that where the party which acquired the admissions cannot demonstrate prejudice, the trial court should extend permission to withdraw and amend. Marshall v. District of Columbia, supra; See alsoAsea, Inc. v. Southern Pacific Transportation Co. (9th Cir. 1981), 669 F.2d 1242, 1248 (`In a proper case . . . such as when an admission has been made inadvertently, Rule 36(b) might well require the district court to permit withdrawal'.) Gary Mun.Airport Auth. V. Peters (CA IN, 1990), 550 N.E.2d 828, 831".
 {¶ 82} A party attempting to withdraw an admission on the eve of trial has a heavy burden; the party must set forth "compelling circumstances" in support of the request to withdraw. ClevelandTrust Co. v. Willis (1985), 20 Ohio St.3d 66, 67,485 N.E.2d 1052.
 {¶ 83} It is within the trial court's discretion whether or not to accept the filing of late admissions. Aetna Cas. Sur.Co. v. Roland (1988), 47 Ohio App.3d 93, 95, 547 N.E.2d 379. Accordingly, an appellate court is not to disturb a trial court's decision unless the trial court abused its discretion. In order to find an abuse of discretion, the trial court's decision must be found to have been unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 84} In the case at bar, we cannot find the trial court's decision to be an abuse of discretion. Appellant has not demonstrated any prejudice from the decision to allow Farmers to withdraw the admission.
 {¶ 85} Appellant testified at trial that he fully cooperated with Farmers investigation of the claim and did everything that was asked of him. (T. at 289). Further, Bart Boston, Senior General Adjuster with Farmers testified that he could not think of anything that appellant did not do that Farmers asked him to do. (Id. at 933). Appellant had the opportunity to question Mr. Boston in advance of trial on this issue during the course of his deposition. Accordingly, appellant was not surprised at trial, nor did he rely solely upon the admission to establish his cooperation with the claim investigation process.
 {¶ 86} As appellant has failed to establish prejudice resulting from the trial court's decision permitting the withdrawal of the admission appellant's Third Assignment of Error is overruled.
 IV. {¶ 87} In his Fourth Assignment of Error appellant contends that the jury verdict finding that Farmers had a reasonable justification to deny his claim and therefore did not act in bad faith is against the manifest weight of the evidence. We disagree.
 {¶ 88} In the case at bar, the jury determined that Farmers breached the insurance contract by not paying appellant's claim. The jury further specifically found in response to Interrogatory No. 4 "by a preponderance of the evidence that Farmers Insurance of Columbus, Inc. acted in good faith (or with reasonable justification) when it denied Mr. Lister's insurance claim."
 {¶ 89} As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. In Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 81, 461 N.E.2d 1273, the Ohio Supreme Court explained: "[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." See, also Statev. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections which cannot be conveyed to us through the written record, Miller v. Miller
(1988), 37 Ohio St. 3d 71.
 {¶ 90} Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (February 10, 1982), Stark App. No. CA-5758. Accordingly, a judgment supported by competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr.
(1978), 54 Ohio St. 2d 279, 376 N.E. 2d 578.
 {¶ 91} As noted in our disposition of Appellant's Second Assignment of Error mere refusal to pay insurance is not, in itself, conclusive of bad faith. Hoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272, 452 N.E.2d 1315. To be found guilty of "bad faith" an insurer who refuses to pay a claim must either have no lawful basis for the refusal coupled with actual knowledge of that fact or intentionally fail to determine whether there was any lawful basis for such refusal. Motorists Mut. Ins.Co. v. Said (1992), 63 Ohio St.3d 690, 590 N.E.2d 1228. Intent that caused the failure may be inferred and imputed to the insurer when there is a reckless indifference to facts or proof reasonably available to it in considering the claim. Id.
 {¶ 92} The insurance policy in the case at bar contains a provision that expressly voids the policy in the case of fraud or in the case of intentional concealment or misrepresentation of a material fact. This is not disputed by the parties on appeal.
 {¶ 93} In the denial of claim letter dated November 11, 2002, Farmers stated: "material misrepresentations in reference to submission of this claim including, but not limited to, your occupancy at the home, your ownership and the value of claimed personal property items, and your claim for damage to the structure of the residence as a result of the subject fire" as reasons to deny the claim. The letter further states: "This letter is not intended to advise you of each and every reason or factual basis for denial of your claim. The denial of your claim is not limited to the reasons set forth herein, and may include additional grounds for non-coverage or breach of any additional policy terms and conditions, including, but not limited to any policy exclusion for intentional acts and any time limitations provisions contained within the policy of insurance."
 {¶ 94} As set forth in the Statement of Facts, supra,
Farmers did conduct a comprehensive evaluation of the claim for the February 4, 2001 fire. The delay in finalizing its decision to deny the claim was not entirely within the control of Farmers. Farmers granted appellant at least three extensions of time to submit his Proof of Loss. The appellant did not submit his Proof of Loss to Farmers until July 30, 2001. As appellant's wife was under indictment for arson with respect to the subject fire, Farmers was not able to take her sworn statement concerning her motivation to start the fire until after she was sentenced in the criminal case. Her examination under oath took place on July 24, 2002. Because she was in prison she was not able to review and verify the examination under oath until late October, 2002. (T. at 1082-83). Accordingly, sufficient, credible evidence is contained in the record from which the jury could conclude that Farmers did not intentionally delay or neglect the appellant's claim for an ulterior purpose.
 {¶ 95} Appellant next argues that the filing of the declaratory judgment Complaint in the first place, and then the later dismissal of the Complaint on the eve of trial, was again unrebutted evidence of bad faith. Attorney Matthew Smith, who had been retained by Farmers to assist in the investigation of the fire loss claim, explained during the trial the reasons behind the filing of the complaint was to obtain an order from the court for Mrs. Lister to appear at an examination under oath as part of the investigation of appellant's claim. (R. 155A; T. 1171). Appellant's own expert admitted during cross-examination that Farmers has an absolute right under its policy to investigate any claim submitted thereunder and that is good practice to obtain sworn statements under oath as part of the investigation of a claim prior to a final decision on such claim. (Id. at 637). Attorney Smith testified that appellant was added as a defendant in the declaratory judgment action because he was the person that submitted a claim under the policy arising out of the subject fire. Accordingly, Smith opined that appellant is an interested party that is required to be made a party to the lawsuit pursuant to Ohio law. (T. 1173). In addition, he explained why it was that the Complaint asked the court to declare that appellant had no rights under the policy if the fire was an intentional act of arson by Mrs. Lister. Smith testified that at the time of the filing of the Complaint, Mrs. Lister had yet to give an examination under oath, and it was yet to be confirmed by sworn testimony whether the act of arson was to obtain insurance proceeds or other reasons. (T. 1171-1172). If the testimony from Mrs. Lister at an examination under oath, which Farmers was seeking, indicated the fire was started to obtain insurance proceeds, then appellant would not be entitled to recovery under the policy. (Id.). Mr. Smith testified that following the examination under oath, Farmers took no effort to further its position, as set forth in the Complaint, that appellant would be unable to collect under the policy because of the intentional act of arson committed by Mrs. Lister. (T. 1180). The examination under oath was ordered by the court and concluded. The testimony confirmed the fire was not related to an effort on her behalf to obtain insurance proceeds. After the investigation was completed Farmers denied the claim for the unrelated basis that appellant committed material misrepresentations connected with the claim.
 {¶ 96} Accordingly, sufficient, credible evidence is contained in the record which if believed would justify the jury in concluding that the filing of the Declaratory Judgment action and its subsequent dismissal were for legitimate, reasonable reasons related to Farmers investigation of the claim.
 {¶ 97} Appellant next contends that Farmers delay in paying the mortgage holder until shortly before trial is evidence of bad faith.
 {¶ 98} Attorney Smith testified that the mortgage holder was entitled to be paid, but only when they submit proof of loss. (T. at 1128). Farmers did sent notice of the fire loss claim and a request for a proof of loss statement to Farmers on or about February 12, 2001; however the mortgage holder never responded to the request for a proof of loss statement.
 {¶ 99} Accordingly, sufficient, credible evidence is contained in the record which if believed would justify the jury in concluding that the failure to pay the mortgage holder until shortly before trial in this case was based upon a legitimate, reasonable reasons related to Farmers investigation of the claim. A question of fact existed which was for the jury to resolve.
 {¶ 100} Appellant additionally claims that the failure of Farmers to provide him with a copy of his policy is evidence of bad faith.
 {¶ 101} The record establishes that when appellant's attorney requested a copy of appellant's policy of insurance, Farmers provided counsel with a copy. (T. at 1165). Appellant has not demonstrated any prejudice from any delay in the receipt of his policy. Accordingly, a question of fact existed for the jury concerning whether the delay was evidence of bad faith. Sufficient, credible evidence is contained in the record which if believed would justify the jury in concluding that any delay in providing the policy to appellant were for legitimate, reasonable reasons related to Farmers investigation of the claim.
 {¶ 102} Appellant's final contention is that the cumulative effect of the above errors establishes bad faith.
 {¶ 103} As previously noted questions of fact existed with respect to appellant's bad faith claim. As the record contains sufficient credible evidence that Farmers actions were based upon legitimate, reasonable ground, we can not say as a matter of law appellant established his claim of bad faith.
 {¶ 104} Appellant's Fourth Assignment of Error is overruled.
 {¶ 105} For the foregoing reasons, the judgment of the Court of Common Pleas, Fairfield County, Ohio, is affirmed.
Gwin, J., Boggins, P.J., and Farmer, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Fairfield County, Ohio, is affirmed. Costs to appellant.